IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs. ) | Cr. No. 05-277 (TFH) |
| ) | |
| QUINTEN M. RANDOLPH, ) | UNDER SEAL |
| ) | |
| Defendant. ) | Sentencing Date: November 30, 2007 |

## DEFENDANT QUINTEN RANDOLPH'S
## MEMORANDUM IN AID OF SENTENCING

Mr. Quinten M. Randolph, by his attorney, pursuant to Federal Rule of Criminal Procedure 32, hereby respectfully submits his memorandum in aid of sentencing. Based on all of the § 3553 sentencing factors in this case, as well as Mr. Randolph's substantial assistance to the government, the defense respectfully submits that Mr. Randolph should be sentenced to time served.

### BACKGROUND

A.   **Quinten Randolph's Background.**

Mr. Randolph turned 23 years old in February 2007. As noted in the PSR, Mr. Randolph was born in Pittsburgh, Pennsylvania. His parents never married. In fact, when Quinten was born, and throughout his youth, his father, Rory Randolph, was married to another women (not Quinten's mother). Rory Randolph had four children by Quinten's mother, and four other children by his wife.

Rory Randolph was not involved in Quinten's upbringing. Quinten reports seeing him on rare occasions during his youth. On those occasions when Quinten did see his father, Quinten mostly recalls his father's abusiveness towards Quinten's mother, Cabrina McCallum. Quinten reports being

aware from a young age that his father was involved in drug dealing. Although Quinten was never directly told, he was aware that his father was in and out of prison. The last time Quinten remembers seeing his father was age seven, right before Rory Randolph was sent away to Lorton. Rory Randolph was stabbed and killed while incarcerated at Lorton in 1993, when Quinten was nine.

Following his father's death, Mr. Randolph's mother began dating another man. Her new boyfriend was addicted to heroin. Ms. McCallum also became addicted. Mr. Randolph reports that both he and his brother witnessed their mother and her boyfriend shooting up heroin when Mr. Randolph was age eleven. Mr. Randolph's mother has not been a constructive presence in his life ever since she began using drugs. Mr. Randolph has not spoken with his mother in nearly two years.

Due to his mother's drug addiction and neglect, Mr. Randolph and his brother began living on the streets when he was age eleven. For approximately a year and a half, Mr. Randolph and his brother lived on the streets, obtaining food and shelter through the kindness of strangers. Mr. Randolph recalls himself and his brother spending many nights sleeping on the playground at Truesdale Elementary School at 800 Ingraham Street, NW. Mr. Randolph recalls panhandling for food and money, and also benefitting from the work of charitable organizations and the Church. Mr. Randolph and his brother would occasionally return to their mother's home, but would seldom find her there. Mr. Randolph reports that there were often homeless people living there, and also that the house was overrun with cats.

At the age of twelve, Mr. Randolph's mother's neighbors called the Child and Family Services Agency (CFSA). The neighbors reported that Quinten and his brother were living in neglect. A social worker from CFSA visited the home when Mr. Randolph was twelve, and Mr. Randolph and his brother were placed in group homes. When Mr. Randolph was thirteen, he was placed in a foster

home. Mr. Randolph reports that it was difficult to fit in with a foster family at the "advanced" age of 13. By the time he was 17, Mr. Randolph had lived with several different foster families.

During his time in foster care, Mr. Randolph attended Bowie High School and then Surratesville High School in Clinton, Maryland. He was at Surratesville through the eleventh grade. Then, at age seventeen, Mr. Randolph was arrested for resisting arrest during a traffic stop. *See* PSR, ¶ 26. The Department of Juvenile Services committed Mr. Randolph to Boys Village, and then eventually ordered Mr. Randolph to Bowling Brook Preparatory School for ten months.

Mr. Randolph excelled at Bowling Brook. Although the PSR reflects that Mr. Randolph got his G.E.D., *see* PSR, ¶ 48. he actually received his high school diploma in the normal course. Furthermore, while the PSR reflects an SAT score of 920, *see id.*, Mr. Randolph's true score was a 980.

Following his graduation from high school, Mr. Randolph attended college at Carroll Community College in Westminster, Maryland. After a year at Carroll, Mr. Randolph was doing so well that he applied, and was accepted, to Howard University. Mr. Randolph has been enrolled at Howard for three years and is presently majoring in Business Communications. At the time Mr. Randolph was stepped back in this case in September 2007, *see* discussion, *infra*, he had paid tuition for the 2007 fall semester at Howard. He is currently one or possibly two semesters away from graduating from Howard (Mr. Randolph has approximately 90 of the 120 credits that are required for graduation).

In addition to going to college to further his studies, Mr. Randolph has also proven that he can succeed in the workplace. It is noteworthy that Mr. Randolph has worked consistently, in one job or another, since he was 14 years old and worked at the neighborhood McDonalds. *See* PSR, ¶ 58. Since

December 2005, Mr. Randolph has worked at several different law firms as a paralegal, investigator and claims processor.[1] For the last ten months (since February 2007), Mr. Randolph has been employed by Nave & Associates, a law firm here in the District of Columbia. Brandi Nave, Esq., the head of the law firm, has written a sentencing letter to the Court which is glowing in its praise for Mr. Randolph and his work at the law firm. *See* Ex. 1 (sentencing letter from Brandi S. Nave, Esq.). Ms. Nave writes:

> I can unequivocally proclaim that Mr. Randolph is an energetic, motivated and conscientious individual. It has been my pleasure to have such a young and focused person to be a part of our growing team. Mr Randolph stands far ahead of others with his professionalism and keen ability to be independently motivated in addition to motivating others. While Mr. Randolph is no stranger to adversity, he continues to persevere in order to positively enrich his life by setting high goals for himself and working hard to accomplish those goals.

*Id.* Ms. Nave's letter is full of many other accolades for Mr. Randolph's character, abilities, and work ethic. *See id.* In addition, Ms. Nave has submitted a letter from a client of the law firm's, Darlene Jackson. Ms. Jackson reports on her tremendous satisfaction with Mr. Randolph's work on her case. *See* Ex. 2 (letter from Darlene Jackson to Brandi Nave re: Quinten Randolph).

In addition to his employment at Nave & Associates, Mr. Randolph has also trained to become a professional real estate agent. Mr. Randolph took a six week real estate course offered by Prudential Carruthers Realtors in the fall of 2006, and passed his Promissor Exam in December 2006. On January 12, 2007, Mr. Randolph received his Real Estate Commission from the District of Columbia. *See* Ex. 3 (Real Estate Commission). Mr. Randolph is now licensed as a Real Estate Salesperson by the District of Columbia government.

---

[1] Prior to his employment at Nave & Associates, Mr. Randolph was employed at the law firms of Quartey & Yumana (December 2005-March 2006), and Taylor & Associates (March 2006-February 2007).

4

Finally, Mr. Randolph has made great progress in his personal life. He is involved in a committed relationship with a woman named Charmaine Battle. Ms. Battle, like Mr. Randolph, is from a broken home. Once Mr. Randolph is released and able to work again, Mr. Randolph and Ms. Battle plan on getting married and starting a family together. Ms. Battle has submitted a sentencing letter to the Court, in which she writes:

> I realize that not everyone gets a second chance to better their lives. Your Honor, Mr. Randolph was separated from his entire family and lost his father in a very tragic way. When he finished telling me his story, I had tears in my eyes. The same tears that I have not, as I'm writing this letter, because I went through the same thing. Since then, Mr. Randolph is in college, employed at a great law firm, and just recently received his Real Estate license. . . .Upon his release, we plan to start a family. . . Mr. Randolph would be a wonderful father.

*See* Ex. 4 (letter to Court from Charmaine Battle).

**B.    Offense Conduct and Pretrial History.**

　　1.　　Offense Conduct

After Mr. Randolph graduated from Bowling Brook, he returned to a group home called Fihankra. *See* Ex. 5 (description of Fihankra Group Home). While at Fihankra, Mr. Randolph's guidance counselor was a man named Marcus Washington. The guidance counselors at group homes such as Fihankra are essentially surrogate parents; they are responsible for the physical and well-being of the children who live there.

Prior to May 2004, Mr. Washington was absent from the group home for about two months. Mr. Randolph and Mr. Washington had had a falling out before Mr. Washington left, but when Mr. Washington came back to the group home he patched things up with Mr. Randolph. He also told Mr. Randolph that if Mr. Randolph could obtain crack cocaine, he (Mr. Washington) had a way for them to make several hundred dollars for themselves. Mr. Randolph asked around and obtained 23 grams of

5

crack. Mr. Washington then took Mr. Randolph to sell the drugs to a buyer who was in fact an undercover police officer.

Over one year later, on May 24, 2005, Mr. Washington again called Mr. Randolph and set up a drug deal. Using the same plan as the first sale, Mr. Randolph again engaged in a drug transaction with the undercover officer, this time for 29 grams of cocaine base. Mr. Washington, the guidance counselor, took Mr. Randolph to this drug deal, as well.

On June 3, 2005, after a phone call from Mr. Washington, Mr. Randolph sold approximately 110 grams of crack to the same undercover officer. Mr. Randolph was arrested the same day.

Later on June 3, 2005, the police executed a search warrant at a residence Mr. Randolph shared with several others, including an individual named James. At the time of the search, James had recently been arrested for carrying a handgun and was incarcerated. The ammunition and holster found at the residence during the search belonged to James, not Mr. Randolph.

Following his arrest, Mr. Randolph immediately agreed to cooperate with the government. The defense understands that the government will speak to Mr. Randolph's substantial assistance at sentencing.

2.  Mr. Randolph's Substance Abuse Issues.

In the two-and-one-half years Mr. Randolph has been under the supervision of Pretrial Services, he has had no new convictions or arrests. He has maintained contact at all times with Pretrial Services. He has not just maintained employment, he has excelled at it. *See, e.g.*, Ex. 1 (sentencing letter from Brandi Nave, Esq.). He has gone to school and obtained his real estate license. *See* Ex. 3 (real estate license). He has begun a committed relationship with Ms. Battle. The sole issue related to Mr. Randolph's compliance with his pretrial conditions are multiple positive tests for marijuana.

When Mr. Randolph was arrested in this case, he suffered from a cocaine (powder) problem that he immediately reported to pretrial services and undersigned counsel. Working under the direction of Pre-trial Services, Mr. Randolph enrolled in the Next Step program to address his drug problem. Mr. Randolph successfully graduated from the program on March 7, 2006. As reported in the PSR, the program was very beneficial for Mr. Randolph. *See* PSR, ¶ 45. Mr. Randolph has not tested positive for cocaine since his graduation from the Next Step program in March 2006.

Since the fall of 2006, Mr. Randolph has, however, tested positive for marijuana on several occasions. In the over two years since Mr. Randolph's arrest, over 90% of Mr. Randolph's drug tests have been completely negative. But he has also tested positive on several occasions, and also has been violated for "water-loading" on several occasions.

Mr. Randolph has paid a significant price for his marijuana use. His marijuana use has resulted in multiple (at least three) weekends in D.C. Jail as sanctions. Since September 2007, for over two months now, Mr. Randolph has been incarcerated at D.C. Jail because of his positive marijuana tests.

Mr. Randolph reports that he uses marijuana by himself to deal with depression, which he has suffered from since a young age. Mr. Randolph has attended counseling on a regular basis since he became a ward of the state at age twelve. He has been diagnosed with post-traumatic stress disorder based on his troubled upbringing, as well as depressive disorder. Mr. Randolph reports that occasional marijuana use relaxes him and has makes him feel better about his past.

Mr. Randolph now understands that his drug use is totally unacceptable, particularly given his family's history of drug use and Mr. Randolph's own background with addiction. Mr. Randolph now understands that someone in his position must work within the system to battle depression and similar issues.

## DISCUSSION

I.  **Under the Section 3553(a) Factors, The Sentence "Sufficient But Not Greater Than Necessary" In This Case Is Time Served.**

   A.  **Under The Facts Of This Case, Which Involve "Crack" Cocaine, The Court Should Reduce Mr. Randolph's Guideline Sentence By the 20:1 Ratio.**

The Court should reduce Mr. Randolph's month guideline range to account for the 100:1 crack/powder disparity built into the offense level for offenses involving crack cocaine. *See United States v. Pickett*, 475 F.3d 1347, 1353 (D.C. Cir. 2007). If that disparity is reduced to 20:1--as advocated by the Sentencing Commission itself--Mr. Randolph's offense level would be a 28. See U.S.S.G. § 2D1.1(c)(7) (offense level for between 5 and 20 grams of cocaine base).[2] After reducing that offense level by 3 levels to account for acceptance of responsibility, Mr. Randolph's **pre-departure** Guidelines range would be **70-87 months.**

   B.  **Quinten Randolph and the 18 U.S.C. § 3553(a) Factors.**

      1.  **The History and Characteristics of Mr. Randolph.**

Mr. Randolph is a very promising young man. He is a success both at work (at Nave & Associates) and at school (Howard University). But for this stupid mistake becoming involved in drugs, Mr. Randolph would be on his way to graduating from Howard, and to a life with limitless possibilities. Even with his felony record, Mr. Randolph can still do great things with his life. He certainly has the intelligence and work ethic to do so.

It is also significant that Mr. Randolph has substantially assisted the government. The Court may consider Mr. Randolph's "efforts to cooperate [as] a sign of positive character development."

---

[2] This offense level is arrived at by multiplying the total quantity of crack in this case (162 grams of crack) by 20, which converts it to powder. The resulting quantity is just over 3.2 kilograms, which produces a pre-acceptance offense level of 28 under the drug quantity table. See U.S.S.G. § 2D1.1(c)(6).

8

*United States v. Qualls*, 373 F. Supp. 2d 873, 876 n.4 (E.D. Wis. 2005).

### 2. The Nature and Circumstances of the Offense.

In terms of the nature and circumstances of the offense, it is true that, over a period of approximately one year, Mr. Randolph sold a large amount of crack cocaine to the undercover officer. Mr. Randolph takes full responsibility for his actions. The Court should also consider, however, Mr. Randolph's young age at the time of the offense (21 years old), and the role that Mr. Randolph's guidance counselor from his group home had in this offense.

### 3. Alternative Sentences Available.

Section 3553(a) also instructs sentencing courts to consider "the kinds of sentences available" to the Court. In this case, one principal concern with Mr. Randolph at this point in time is his positive drug tests for marijuana. Mr. Randolph's marijuana use is related to mental health issues, for which he should receive mental health counseling (even setting aside the marijuana use, mental health counseling would appear appropriate based on the issues surrounding Mr. Randolph's upbringing). The defense respectfully submits that Mr. Randolph's mental health and substance abuse issues can be dealt with through the Probation office, in a non-custodial setting. The defense accordingly asks that the Court afford Mr. Randolph the opportunity to deal with these issues through the Probation Office, rather than in a prison setting.

## CONCLUSION

Mr. Randolph is a young man of great promise. Even with this case, his first--and expectedly last--felony conviction, Mr. Randolph can do great things in life. His vast potential is particularly remarkable for someone who had to suffer through a childhood like Mr. Randolph's. For these reasons, as well as all others just and proper, the defense respectfully submits that Mr. Randolph should receive a sentence of time served.

Respectfully submitted,

A.J. Kramer
Federal Public Defender

_____
Jonathan S. Jeffress
Counsel for Quinten Randolph
Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Washington, D.C. 20004
(202) 208-7500, ex. 134